# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| EARL OSBORN,<br>    Plaintiff,<br><br>    v.<br><br>CHRISTOPHER WILLIAMS, et al.,<br>    Defendants. | No. 3:14-cv-1386 (VAB) |

**RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Earl Osborn ("Plaintiff" or "Mr. Osborn"), currently incarcerated at MacDougall-Walker Correctional Institution ("MacDougall") in Suffield, Connecticut, has sued various MacDougall employees under 42 U.S.C. § 1983 for their failure to protect him in violation of the Eighth Amendment's prohibition of "cruel and unusual punishments." U.S. Const. amend. VIII. Mr. Osborn seeks declaratory relief and an award of damages from the MacDougall employees who Mr. Osborn contends acted with deliberate indifference to the physical violence he suffered at the hands of his cellmate.

Then-Lieutenant Ruben Burgos ("Lieutenant Burgos"), Lieutenant Christopher Williams ("Lieutenant Williams"), Lieutenant Jason Beebe ("Lieutenant Beebe"), Clinical Social Worker James Castro ("Mr. Castro"), Correctional Officer Lyndon Standard ("Officer Standard"), John Doe, Jane Doe 1, and Jane Doe 2 (collectively "Defendants") have moved for summary judgment, arguing that Mr. Osborn failed to exhaust all available administrative remedies before filing this lawsuit, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).

For the reasons that follow, Defendants' motion is **GRANTED**.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. FACTUAL ALLEGATIONS

To Mr. Osborn, it all started when he was transferred to Cell N-29 of MacDougall's N-Pod on October 3, 2013. Pl.'s SMF at 6. "Right off the bat" his cellmate, John Hightower, allegedly exhibited a "hostile attitude" toward Osborn, *id.*; Def.'s Br., Ex. C, Osborn Dep. at 18:11–12, attempting to intimidate Mr. Osborn physically by threatening to rape and murder him, Pl.'s SMF at 6.

Mr. Osborn voiced his concerns about Mr. Hightower to various members of MacDougall's staff. Mr. Osborn met with Nurse Tawanna Furtick in the medical unit. Pl.'s SMF at 3; Defs.' SMF ¶ 8. Osborn complained to Nurse Furtick: "They got me housed with this maniac." Pl.'s SMF at 8.

While at the medical unit, Mr. Osborn also spoke with Lieutenant Burgos about his concerns with Mr. Hightower. Although Lieutenant Burgos maintains that during their conversation Mr. Osborn informed him that Mr. Osborn merely complained that Mr. Hightower "talk[ed] way too much" and Mr. Osborn "wanted to be left alone," Defs.' Br., Ex. F, Burgos Aff. ¶ 6, ECF No. 50-7, Mr. Osborn alleges that he informed Lieutenant Bargos that Mr. Hightower was threatening to do bodily harm to Mr. Osborn. Pl.'s SMF at 8. Mr. Osborn allegedly told Lieutenant Bargos: "[Hightower] said he was going to kill me. He said he was going to throw me underneath the toilet and bang my head up against the toilet, and that no one will find out about it." Osborn Dep. at 25:3–9, Defs.' Br., Ex. C, ECF No. 50-4.

---

[1] The relevant facts are taken from Defendants' Local Rule 56(a)(1) Statement ("Defs.' SMF"), ECF No. 50-8, and attached exhibits, ECF Nos. 50-2–50-7, and Mr. Osborn's Local Rule 56(a)(2) Statement ("Pl.'s SMF"), ECF No. 53-13, and attached affidavits and exhibits, ECF Nos. 53-1–53-12. *See* D. Conn. L. Civ. R. 56. The facts are undisputed unless otherwise noted.

On October 11, 2013, Mr. Osborn spoke with Licensed Social Worker Deborah Eddinger (then Rothbaum) about "issues with [his] current cellie." *Id.* In her treatment notes, Ms. Eddinger wrote: "The captain reports [Mr. Osborn and Mr. Hightower] will be separated on second shift." Pl.'s Opp., Ex. B, Eddinger Dep. at 27:16–20, ECF No. 53-3; Eddinger Dep., Ex. 8(B), Osborn Clinical Rec., ECF No. 53-3, at 57. Nothing allegedly came of the captain's assurance. *See* Osborn Aff. ¶ 4, ECF No. 53-12 ("I told them Hightower was telling me he was going to hit my head on the toilet, going to kill me, dispose of my body where nobody would ever find it. I was told in Debbie [Eddinger]'s officer I would be transferred and I trusted them.").

Then, early on October 13, 2013, Mr. Osborn claims Mr. Hightower violently assaulted him, and claims Defendants, knowing the danger Mr. Osborn's cellmate posed to him, failed to protect him. Pl.'s SMF at 2; Defs.' SMF ¶ 4. Between 1:30 a.m. and 1:55 a.m. that morning, Mr. Osborn contends that Mr. Hightower punched Mr. Osborn in the head. Pl.'s SMF at 7. Mr. Osborn also alleges that Mr. Hightower grabbed and twisted Mr. Osborn's foot, breaking his toe. *Id.*

### 1. Plaintiff's Mental State

Mr. Osborn acknowledges suffering from "a mental condition." Osborn Aff. ¶ 6. On November 14, 2013, a MacDougall medical professional with whom Mr. Osborn met noted: "Inmate did well off meds for a couple of months but then decompensated . . . . " Defs.' Br., Ex. E, CMHC JDH Psychiatric Note, ECF No. 50-6 at 8. She noted that, upon restarting medication therapy, Mr. Osborn "appear[ed] to be back at his baseline." *Id.*; *see generally id.* at 12–16 (including notes from medical care providers Mr. Osborn saw between November 8, 2013, and November 15, 2013).

## 2. MacDougall's Grievance Procedures

An inmate at a Connecticut Department of Correction facility who wishes to file a grievance must follow the procedure established in Connecticut Department of Correction Administrative Directive 9.6 ("Directive 9.6"). *See generally* Conn. Dep't of Corr. Admin. Directive 9.6, effective August 15, 2013, Defs.' Br., Ex. A, ECF No. 50-2. "All matters subject to the Commissioner's authority . . . are grievable." *Id.* § 6(B).

Under Directive 9.6, administrative review generally occurs in three steps. First, an inmate must seek to resolve his or her complaint informally by depositing an Inmate Request Form (CN 9601) in a designated collection box. *Id.* § 6(A). If the inmate is dissatisfied with the response to his or her Inmate Request Form or does not receive a response within fifteen days, *id.*, the inmate may proceed to the second step, which is termed "Level One Review." *Id.* §§ 6(C), 6(I). To initiate Level One Review, an inmate completes the Inmate Administrative Remedy Form (CN 9602). *Id.* § 6(C).

At this point, the inmate is required to provide evidence that he or she attempted to informally resolve his or her grievance by attaching the Inmate Request Form (CN 9601) to CN 9602. *Id.* The inmate also has the option of submitting CN 9602 without attaching CN 9601 and providing a "valid reason" why he or she could not obtain the form. *Id.* In the Administrative Directive, the Department of Correction indicates that not receiving a "timely response" to an inmate request would be a "valid reason" for not attaching the CN 9601 form. *Id.* Level One Review is undertaken by the Unit Administrator, who must respond to the grievance in writing within thirty days. *Id.* § 6(I).

An inmate may proceed to the third step, Level Two Review, if he or she disagrees with the Unit Administrator's judgment or does not receive a timely response. *Id.* Generally, Level

Two Review takes place before a District Administrator and is the final stage of appeal. *Id.* § K. Level Three appeals are restricted to challenges to department policy or the integrity of the grievance procedure, or to appeals of Level Two grievances to which the District Administrator has failed to respond in a timely manner. *See id.* § (6)(L).

### 3. Plaintiff's Grievances

On four occasions, Mr. Osborn used MacDougall's grievance procedure to challenge aspects of the October 13, 2013, incident with Mr. Hightower. Defs.' SMF ¶ 6. Mr. Osborn filed these grievances on March 1, 2014, March 7, 2014, March 7, 2014, and March 14, 2014. *Id.* ¶ 7. Mr. Osborn maintains that he also made a written complaint to the "Captain/Unit Manager" on October 11, 2013, regarding Mr. Hightower's hostile behavior. Pl.'s SMF at 7–8. This complaint allegedly went unanswered. *Id.* at 8.

Mr. Osborn availed himself of Level Two Review with regard to his March 1, 2014, grievance.[2] April 24, 2014, Inmate Grievance Form, Defs.' Br., Ex. B, ECF No. 50-3 at 9. Mr. Osborn's Level Two Review was rejected on June 11, 2014. *Id.* It reads:

> Your level 2 appeal is rejected for the reason stated by Warden Chapdelaine on the level 1 response. The Administrative Remedies Directive states a grievance must be filed within 30 days of the incident or discovery. You have failed to do so. In addition, CO Williams was not involved in the incident of 10/13/13 as you have stated. The incident of 10/13/15 consisted of you sitting in front of you [*sic*] cell door and masturbating. You were issued a DR for Public Indecency and plead guilty to that DR. You were seen by Medical personnel on 10/13/2013 and you denied any injuries. Your level 2 appeal is rejected.

---

[2] Mr. Osborn concedes that he did not administratively appeal his March 14, 2017, grievance, which was rejected because it was not filed within 30 days of the October 13, 2014, incident. Osborn Dep. at 60:16–23, Defs.' Br., Ex. C. Directive 9.6 provides that an application for administrative remedy is "[r]ejected" when the application "does not meet the application requirement of the particular remedy." Directive 9.6 § 3(H).

Mr. Osborn maintains that he administratively appealed his two grievances dated March 7, 2014, which were both rejected as untimely, but does not recall the disposition of Level Two review regarding either grievance. Osborn Dep. at 64:10–68:8, Defs.' Br., Ex. C. MacDougall's grievance coordinator's search of Mr. Osborn's grievance filings did not return a Level Two appeal of either grievance. *See* Defs.' Br., Ex. B.

*Id.* at 10.

B. **PROCEDURAL HISTORY**

Proceeding *pro se*, Mr. Osborn brought suit against then Lieutenant Ruben Burgos ("Lieutenant Burgos"), Lieutenant Christopher Williams ("Lieutenant Williams"), Lieutenant Jason Beebe ("Lieutenant Beebe"), Clinical Social Worker James Castro ("Mr. Castro"), Correctional Officer Lyndon Standard ("Officer Standard"), John Doe, Jane Doe 1, and Jane Doe 2 (collectively "Defendants"). ECF No. 1. More specifically, Mr. Osborn' Complaint sought a declaratory judgment and an award of compensatory and punitive damages against Defendants in their individual capacities for their deliberate indifference to Mr. Osborn's health and safety and for loss of personal property. *Id.*

Under 28 U.S.C. § 1915(b)(1), the Court dismissed Mr. Osborn's Fourteenth Amendment claim against John Doe. The Court allowed Mr. Osborn's Eighth Amendment claim to proceed against the remaining defendants. Initial Review Order at 5, ECF No. 8.

The Court, finding that the proper and effective litigation of Mr. Osborn's case required appointment of counsel, appointed *pro bono* counsel to represent Mr. Osborn in his case. ECF No. 38.[3] After discovery, Defendant's moved for summary judgment against Mr. Osborn's remaining claim. ECF No. 50.

II. **STANDARD OF REVIEW**

The Court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine

---

[3] The Court notes that the written submissions and oral argument provided by appointed counsel, Michael Thad Allen, on Mr. Osborne's behalf, reflected high-quality work.

dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Id.* at 250.

The Court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). The Court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

### III. DISCUSSION

The threshold question is whether Mr. Osborn exhausted all available administrative remedies before filing this lawsuit, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Specifically, the Court must decide whether there is a genuine issue of material fact as to whether MacDougall's grievance process was actually "available" to Mr. Osborn. Mr. Osborn argues that the grievance process was not "available" to him and therefore, exhaustion of the administrative remedies was not required. The Court disagrees.

The PRLA provides that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion

7

requirement applies to all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless of whether the inmate may obtain the specific relief he desires through the administrative process, *Booth v. Churner*, 532 U.S. 731, 738 (2001).

Failure to exhaust administrative remedies under 42 U.S.C. § 1997e(a) is an affirmative defense. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, defendants have the burden of proving that a plaintiff has not exhausted claims before filing in court. *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

The PLRA requires "proper exhaustion," which includes complying with all "procedural rules," including filing deadlines, as defined by the particular prison grievance system. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). In other words, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford*, 548 U.S. at 83–84).

In *Ross v. Blake*, __ U.S. ___, 136 S. Ct. 1850 (2016), the Supreme Court rejected judicially created special exceptions to the PRLA's exhaustion requirement. *See id.* at 1362 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement"). The Court concluded that the PLRA includes a single "textual exception"—that an inmate need not exhaust remedies that are not "available" to him or her. *Id.* at 1858.

The Court described three scenarios in which administrative procedures that have been officially adopted by a prison facility may be unavailable to an inmate. *Id* at 1859. First, an administrative remedy may be unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, a

remedy might be "so opaque that it becomes, practically speaking, incapable of use" because an "ordinary prisoner can[not] discern or navigate it [or] make sense of what it demands." *Id.* (citations omitted). Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Following *Ross*, the Second Circuit, in *Williams v. Correction Officer Priatno*, 829 F.3d 118 (2d Cir. 2016), established a two-part inquiry to guide the analysis of whether a plaintiff has satisfied the PLRA. First, courts must ask "whether administrative remedies were in fact available to the plaintiff." *Id.* at 122. Second, a court must consider "whether administrative remedies were actually available to the aggrieved inmate." *Id.* at 123 (citing *Ross*, 136 S. Ct. at 1858–59).

The parties do not dispute whether an administrative remedy was available in fact, but disagree on whether administrative remedies were "capable of use" by Mr. Osborn "to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted (quoting *Booth*, 532 U.S. at 738)). Mr. Osborn argues that prison officials' "misrepresentations and machinations corrupted the administrative process, which was never actually available to Osborn." Pl.'s Opp. Br. at 17.

Mr. Osborn's argument has two separate, but related, parts. First, he argues that, by allegedly losing Mr. Osborn's October 11, 2013, Inmate Request Form and endorsing Defendants' "humiliatingly false masturbation story," the administrative process operated as "a simple dead end." *Id.* at 18. Second, Mr. Osborn argues that Defendants' "misrepresentations and machinations thwarted the process, worsening Osborn's mental disability and ensuring that he

9

was deprived of relief." *Id.* Defendants respond that neither argument can serve as a basis to excuse Mr. Osborn from administratively exhausting his claim. Defs.' Br. at 2. The Court agrees.

### A. THE OCTOBER 11, 2013, INMATE REQUEST FORM

Mr. Osborn cites to *Williams* to support his contention that Defendants' conduct rendered administrative remedies unavailable to him. Pl.'s Br. at 18. In *Williams*, the Second Circuit notes that "the behavior of the defendants may render administrative remedies unavailable." 829 F.3d at 123. This case, however, is inapposite to that one.

In *Williams*, plaintiff, after several correction officers brutally beat him, drafted a grievance detailing the officers' misconduct and, consistent with grievance procedure, gave the grievance to a correction officer to forward to the grievance officer. *Id.* at 121. Plaintiff never received a response to the grievance; neither did he appeal the grievance. *Id.* The court found that the regulations at issue "[did] not contemplate the situation in which [plaintiff] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* The court held that the regulatory scheme for appealing plaintiff's grievances was "so opaque" and "so confusing that . . . no reasonable prisoner can use [it]." *Id.* at 124. There, the regulatory code that governed the administrative grievance process for the New York State Department of Corrections and Community Supervision only contemplated appeals of grievances that were actually filed. *Id.* 124, 126.

Here, by contrast, Regulation 9.6, at each step of the grievance process, contemplates, in unequivocal terms, appeals of grievances that may have gone unfiled and, in turn, could go unanswered. *See* Directive 9.6 § 6(C) ("If the inmate . . . did not receive a timely response to the inmate request, . . . the inmate shall include an explanation indicating why CN 6901, Inmate Request Form, is not attached."); *id.* § 6(I) ("If a response to a Level 1 grievance is not received

within 30 business days, an inmate may appeal to Level 2."); *id.* § 6(L) (providing that an inmate may appeal a Level 2 disposition to Level 3 when a grievance "[e]xceeds the established 30 business day time lime for a Level 2 grievance response."). To avail himself of relief from exhaustion available under *Williams*, Mr. Osborn therefore had to establish a genuine issue of material fact as to whether the grievance process set out in Directive 9.6 is "so confusing that . . . no reasonable prisoner can use [it]." *Williams*, 829 F.3d at 124.

Mr. Osborn, however, has not presented any such material facts. Following the alleged October 13th incident with Mr. Hightower, Mr. Osborn had to file within thirty calendar days of the occurrence or discovery of the cause of the grievance an Inmate Administrative Remedy Form. Directive 9.6 § 6(C). He failed to file his grievance in a timely manner, and, thus, he failed to exhaust his administrative remedies. *See Ruggiero*, 467 F.3d at 176 ("[U]ntimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements." (quoting *Woodford*, 548 U.S. at 83–84)); *Mena v. City of N.Y.*, No. 13-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (holding that the fact that a plaintiff's initial grievance received no response was "insufficient" to show that a grievance procedure amounted to a "dead end"); *Williams v. Hupkowicz*, No. 04-0051, 2007 WL 1774876, at *4 (W.D.N.Y. June 18, 2007) ("Even assuming that an inmate received no timely official response as contemplated by the regulations to a grievance at any stage in the inmate grievance process, the inmate could nevertheless appeal such grievance to the next level, and the failure to do so constitutes a failure to exhaust his administrative remedies as required under the PLRA.").

Although Mr. Osborn raises arguments about why he could not have been expected to use the grievance system to seek administrative relief, his testimony about his circumstances, standing alone, does not create a genuine issue of material fact as to whether Directive 9.6 is "so

confusing that . . . no reasonable prisoner can use [it]." *Williams*, 829 F.3d at 124; *see also Ross*, 136 S.Ct. at 1858 ("[T]he PRLA prevent[s] a court from deciding that exhaustion [is] unjust or inappropriate in a given case."); *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 585 (N.D.N.Y. 2017) (finding the administrative procedure was unavailable where plaintiffs "made a clear and persuasive showing" that "staff consistently refus[ed] to provide grievance forms, ignor[ed] grievances, and in some cases thr[ew] grievances in the trash"). As a result, Mr. Osborn's argument that he should be excused from the PLRA's administrative exhaustion requirement because officials allegedly failed to respond to his written complaint and his written complaint alone fails as a matter of law.

### B. THE JUNE 11, 2014, LEVEL TWO REVIEW REJECTION

Mr. Osborn also claims that by rejecting Mr. Osborn's Level Two Review and allegedly endorsing, "on the merits," Defendants' "humiliatingly false masturbation story" hopelessly corrupted the administrative process. Pl.'s Opp. Br. at 18. This argument, too, falls short of creating a genuine dispute of material facts.

First, as noted above, *see supra* Part III.A., there was a process available to Mr. Osborn; yet, he failed to file a grievance within thirty days of the October 13, 2013, incident. Although the Second Circuit held in *Hill v. Curcione* that "a late filing that is accepted and decided on the merits fulfills the exhaustion requirement," here, unlike in *Hill*, prison officials rejected Mr. Osborn's Level Two Review for being untimely. 657 F.3d 116, 125 (2d Cir. 2011); *compare id.* ("The Coordinator did not reject the grievance for untimeliness."), *with* April 24, 2014 Inmate Grievance Form at 10, Defs.' Br., Ex. B ("Your level 2 appeal is rejected for the reason stated by Warden Chapdelaine on the level 1 response. The Administrative Remedies Directive states a grievance must be filed within 30 days of the incident or discovery. You have failed to do so.").

12

Mr. Osborn concedes as much. *See* Pl.'s Opp. Br. at 19 ("In *Hill*, unlike here, the government agency did not invoke procedural defenses in addition to the merits.").

Mr. Osborn, nonetheless, argues that, because Defendants based their earlier motion for summary judgment, ECF No. 21, on the "false masturbation story," *Hill* governs. *Id.* at 19–20. The Court disagrees.

The Court dismissed Defendant's first motion for summary judgment without ruling on its merits. *See* ECF No. 29. Also, although Mr. Osborn argues that MacDougall officials fabricated the public masturbation charge, Mr. Osborn plead guilty to the charge. Osborn Dep. at 43:16–18. Accordingly, because Mr. Osborn's guilt was not established by operation of the grievance process, there is no basis for considering his rejected Level Two Review a determination reached "on the merits" and, in turn, no basis to argue that Defendants, like in *Hill*, therefore should be estopped from invoking an administrative exhaustion defense.

More importantly, the so-called "false masturbation story" does not create a genuine factual dispute as to whether MacDougall officials may have thwarted the grievance process. Because, however aggrieved Mr. Osborn may have felt by the disciplinary report for public masturbation, Directive 9.6 provides an administrative vehicle for inmates to seek relief from disciplinary action. *See* Directive 9.6 § 4(E) ("An appeal of a guilty finding received at a disciplinary hearing shall be in accordance with Section 10 of this Directive."); *id.* § 10 ("A guilty finding received at a disciplinary hearing may be appealed by completing and depositing CN 9602, Inmate Administrative Remedy Form, in the Administrative Remedies box within 15 calendar days of the notice of decision."). And Mr. Osborn does not dispute that he failed to appeal the disciplinary charge.

As a result, although Mr. Osborn raises an issue about whether prison officials at MacDougall improperly discipline inmates, the critical issue for purposes of exhaustion under the PRLA is the fairness of the procedure for resolving grievances. Although the former issue, whether prison officials at MacDougall fabricate disciplinary violations, is not, by definition, wholly unrelated to the latter issue, whether prison officials at MacDougall "thwart inmates from taking advantage of a grievance process through machination, misrepresentation," there is no admissible evidence in the record to suggest that the former is sufficiently probative of the latter. *See Ross*, 136 S. Ct. at 1862 (asking "is there persuasive evidence that Maryland officials thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentations, either on a system-wide basis or in the individual case?"); *see also* Fed. R. Ev. 401 (providing that evidence is relevant if "it has a tendency to make a fact more or less probable . . . and the fact is of consequence in determining the action."); Fed. R. Ev. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury. . . ."); *see, e.g.*, *Gotlin ex rel. Cty. of Richmond v. Lederman*, No. 04 CV 3736 (ILG), 2010 WL 1779984, at *8 (E.D.N.Y. May 3, 2010), *aff'd*, 483 F. App'x 583 (2d Cir. 2012) (holding that evidence relating to past professional misconduct charges brought against defendant had "no relevance at all to this action for medical malpractice and Rule 401 Fed. R. Ev. preclude[d] it for that reason and if it had even a scintilla of probative value, the prejudice and confusion of the issues it would engender would demand its preclusion."). Mr. Osborn, on this ground, therefore has failed to raise a genuine dispute as to any material fact.

## C. MR. OSBORN'S MENTAL CAPACITY

Finally, Mr. Osborn argues that there is a dispute of material fact as to whether he was of sufficient mental capacity to avail himself of the administrative process. Pl.'s Opp. Br. at 20. He maintains that "Defendants' fundamental unfairness threw Osborn into a tail spin, making his mental condition worse and prevented him from pursuing administrative remedies." *Id.* at 21. The Court disagrees.

Outside of the narrow textual exception to the PLRA's exhaustion requirement, this Court cannot "look to all the particulars of a case to decide whether to excuse a failure to exhaust." *Ross*, 136 S. Ct. at 1853. As the Supreme Court made clear in *Ross*, "such wide-ranging discretion 'is now a thing of the past.'" *Id.* (quoting *Booth*, 532 U.S. at 739). Consistent with that approach, the Second Circuit in *Williams* asked whether "the regulations contemplate the situation in which the prisoner finds himself." 829 F.3d at 124. "This is an objective question: the regulations either provide the inmate with a procedural route to obtain administrative relief, or they do not." *Green v. Schmelzle*, 239 F. Supp. 3d 669, 672–73 (W.D.N.Y. 2017). Here, MacDougall's grievance regulations provide Mr. Osborn "with a procedural route to obtain administrative relief." *Id.* Other than the inquiries engaged in by this Court above, this Court is not free to initiate another one to ensure that Mr. Osborn has a path to relief that contemplates his individual mental state, and presumably the specific mental state of every other prisoner under the care of the Department of Correction.

Even if this Court could undertake that inquiry, it would not bear the fruit that Mr. Osborn seeks, at least on this record. Mr. Osborn claims that he was in a fragile state "at precisely that time when Defendants punished him for being attacked." Pl.'s Opp. Br. at 21. To support his argument, Mr. Osborn states: "I also suffer symptoms of [a] mental condition. When

15

I follow the doctors' instructions, it is under control. After Hightower attacked me and these CO's of MacDougall used a false story to blame me for it, my condition got a lot worse." Osborn Aff. ¶ 6, ECF No. 53-12. Mr. Osborn's statements, however, fail to establish precisely when his "condition got a lot worse." If this happened more than thirty days after the alleged October 13, 2013, incident, then this would not have been probative of whether he had the mental capacity necessary to file a grievance within the thirty-day time period.

In any event, Mr. Osborn's own assessment about his mental capacity would not be sufficient to create a genuine issue of fact. If the issue is whether Mr. Osborn had the mental capacity necessary to file a grievance within thirty days of the alleged October 13, 2013, incident, his lay testimony alone could not suffice to make that showing. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("The evidence considered on summary judgment must generally be admissible evidence.") (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 271 (2d Cir. 2002)); *Sarno v. Douglas Elliman– Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (holding that the plaintiff, in relying on non-admissible evidence, "failed to adduce any evidence sufficient to create a genuine issue to be tried"). Any probative facts regarding Mr. Osborn's mental capacity during the relevant thirty-day period would have to be provided through expert testimony. *See* Fed. R. Ev. 702 ("A witness who is qualified . . . may testify in the form of an opinion or otherwise if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ."); *see, e.g.*, *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) ("[E]xpert medical opinion evidence is usually required to show the cause of an injury or disease." (citation omitted)).

## IV. CONCLUSION

Having found that Mr. Osborn failed to exhaust administrative remedies that were "knowable by an ordinary prisoner," *Ross*, 136 S. Ct. at 1862, the PLRA requires that his case be dismissed. Accordingly, the Court does not reach Mr. Osborn's Eighth Amendment claim.

For the reasons discussed above, Defendants' motion for summary judgment is **GRANTED**, and the case is dismissed.

The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of December, 2017.

    /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE